## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WYSAN R. LONGSTREET,

    Plaintiff,

    v.

CASEY M. CAMPBELL,
*Warden*,
STACEY TAYLOR,
*Chief of Security*,

    Defendants.

Civil Action No.:  SAG-21-59

## MEMORANDUM

Pending in this civil rights case is Defendants Warden Casey M. Campbell ("Campbell") and Chief of Security Stacey Taylor *n/k/a* Stacey Carter's ("Carter's") motion to dismiss the complaint or, in the alternative, for summary judgment in their favor.  ECF 17.  Plaintiff Wysan R. Longstreet ("Longstreet"), who proceeds pro se, opposed the motion.  ECF 20 and 22.  After this Court denied the parties' motions for sanctions and to strike, Defendants were directed to file a surreply (ECF 28) responding to Longstreet's "Affidavit of Facts" (ECF 25).  Defendants' surreply was filed on November 3, 2021.  ECF 30.  Also pending is Longstreet's motion for injunction.[1]  ECF 29.  No hearing is necessary to resolve these matters.  *See* Local Rule 105.6 (D.

---

[1]    Longstreet's motion for injunction, dated October 16, 2021, seeks an order from this court prohibiting consideration of a notice of infraction issued by K. Donnelly for possession of a weapon in connection with the exhibit Longstreet filed with this court.  *See* ECF 25 (filed separately).  The basis of his motion centers on a claim that the notice of infraction is retaliation for this lawsuit and for submitting "creditable evidence" to refute Defendants' dispositive motion.  ECF 29.  The motion amounts to an entirely new claim against persons who are not parties to this case.  Further, Longstreet's pleading is dated three days after the notice of infraction was issued; there is no doubt that Longstreet has not attempted to address his grievance with the infraction through appropriate channels within the prison.  To the extent that Longstreet wants to file a separate claim, he may do so in a separate civil rights complaint.  His motion shall be denied without prejudice.

Md. 2021).  For the reasons that follow, Defendants' motion shall be granted and Plaintiff's motion for injunction shall be denied.

## Background

### A. Complaint Allegations

Plaintiff Longstreet was incarcerated at Roxbury Correctional Institution ("RCI") at all times relevant to this complaint.[2]  Longstreet states that he wrote to Defendant Warden Campbell on October 20, 2020, to let him know that Correctional Officer Wells was violating her post orders when she was working in Longstreet's housing unit by staying "inside of the control booth instead of sitting at the desk on the tier."  ECF 1 at 3, ¶ 7.  Longstreet also complained that security cameras "must be installed on each tier" to ensure officers are obeying post orders.  *Id.*

On November 20, 2020, Longstreet wrote to Assistant Warden Michael Linchtenberg and Defendant Chief of Security Carter complaining about Wells.[3]  ECF 1 at 3, ¶ 8.

On November 25, 2020 at approximately 2:00 p.m., Longstreet recalls that Wells stopped at his cell door as she conducted count.  ECF 1 at 3, ¶ 9.  Longstreet's cellmate, Phillip Sisler, asked Wells how long it would take for Longstreet to "bleed out if he were to stab [him] in the neck."  *Id*.  According to Longstreet, Wells answered that it would take three hours and then asked Sisler "not to do it during her shift because she did not want to be stuck 'doing paperwork all evening.'"  *Id*.  He recalls that Wells and Sisler then shared a laugh before Wells walked away to continue the count.  *Id.*

---

[2]	Longstreet was transferred to Maryland Correctional Institution - Hagerstown ("MCIH") while this case has been pending and was subsequently transferred to Eastern Correctional Institution ("ECI").  ECF 20-1; ECF 26.

[3] Longstreet did not name Wells or any of the other correctional officers allegedly involved in the described incidents as defendants in his complaint.

An hour after the exchange between Wells and Sisler, Longstreet states that Sisler accused Longstreet of filing Prison Rape Elimination Act ("PREA") charges on people and suing them.[4] ECF 1 at 4, ¶ 10. Longstreet asked Sisler what he was talking about and turned his back to Sisler. *Id*. Sisler responded by threatening to kill Longstreet and stabbing Longstreet in the neck. *Id*. Longstreet ducked when he felt the object penetrate the right side of his neck, causing Sisler to stab Longstreet in his back near his spine. *Id*. Longstreet then turned towards Sisler to defend himself, but as he was turning around, Sisler used his weapon to slice Longstreet across his spine. *Id*. Longstreet describes the wound across his back as being about 152 cm long. *Id*.

As Sisler swung his weapon a third time, Longstreet rushed toward him in an effort to prevent another attack. ECF 1 at 4, ¶ 11. Longstreet states he grabbed Sisler's wrist and hand holding the weapon, whereupon Sisler became fearful and called for help. *Id*. The fight continued with the two men tussling over the weapon for what Longstreet recalls as about 20 minutes. *Id*. at ¶ 12. Because of the large amount of blood coming from Longstreet's wounds, both men were slipping. *Id.* Longstreet managed to get behind Sisler and put him in a chokehold, but Sisler bit Longstreet's left forearm and began stabbing Longstreet in his left leg. *Id*. at 4-5, ¶ 12.

Longstreet describes the wounds to his left leg as being "the size of a quarter" and "the size of a nickel" and states that "blood started pouring from [his] leg at a rapid speed" causing a puddle of blood to form inside the cell. ECF 1 at 5, ¶ 13. Both Sisler and Longstreet lost their balance and began falling towards the floor. *Id*. Longstreet recalls that as they were falling, he managed to "pull Inmate Sisler's t-shirt over his head; then . . . secured the t-shirt around both of his wrist[s]

---

[4]     Longstreet explains that he filed a lawsuit against Officer Cutshall for a 2017 sexual assault and the only way Sisler could have known about that lawsuit is if Wells had told him. ECF 1 at 10, ¶ 27. He recalls that Wells and Sisler had private conversations each time she was assigned to their housing unit. *Id*.

to prevent him from injuring [Longstreet] any further." *Id*.  When Sisler tried to kick him, Longstreet "used [his] left hand to pull down [Sisler's] pants in order to secure them around his knees." *Id*.

Officer Elsea arrived at the cell door holding a can of mace and ordered Longstreet and Sisler to lay face down on the floor.  ECF 1 at 5, ¶ 14.  Longstreet tried to explain that Sisler was holding a weapon and that if he let go, he would continue to be stabbed.  *Id*.  Longstreet asked Elsea to grab Sisler so that he could safely comply with the order.  *Id*.  Officer Oteng then arrived and said, "this [is] how you do it" and deployed the mace toward Sisler and Longstreet.  *Id*. Longstreet asked for Oteng to stop spraying because he has asthma, but he claims that Oteng kept spraying the mace even after both inmates had stopped fighting and were complying with orders. *Id*.  The weapon Sisler used is described as a six-inch piece of metal sharpened to a point on one end with a cloth handle.  ECF 17-3 at 5 (Internal Investigation Division Report); 88 (photo of weapon).

Longstreet recalls that Sisler was removed from the cell first and he was instructed to exit the cell backwards.  ECF 1 at 6, ¶ 15.  When Longstreet tried to tell Oteng that he could not do this because he had lost feeling in his left leg, his protest was met with apathy from Oteng.  *Id*. Longstreet resorted to sliding out of the cell using the blood that covered the floor.  *Id*.  Oteng then handcuffed Longstreet and forced Longstreet from the floor by pulling the chain on the handcuffs. *Id*. at ¶ 16.  When Oteng began making Longstreet walk, another officer noticed that Longstreet was dragging his injured leg and that he was bleeding heavily from the stab wounds.  *Id*. Longstreet does not explain how he was transported from the housing unit to the dispensary but recalls that when he arrived there, he asked if Oteng would check his wrist because it was hurting. *Id*. at ¶ 17. Oteng told him to shut up.  *Id*. The nurse who was treating Longstreet told Oteng to

remove the handcuffs because they were cutting off his circulation.  *Id.*  Longstreet states that the handcuffs cut a piece of flesh from his wrist, requiring eight stitches to repair.  *Id.*

Longstreet states that his injuries required four stitches to his neck, two in his back, eight in his wrist, and eight in his leg.  ECF 1 at 7, ¶ 18.  As a result of the attack and Oteng's misuse of the handcuffs, Longstreet states he had nineteen wounds, has lost the feeling in the lower half of his left leg, and is no longer able to move his big toe.  *Id.*  Longstreet states he has not received any pain relievers to address the pain in his leg or for the migraines he now endures as a result of the stab wound to his neck.  *Id.* at ¶ 19.  Despite his requests to be evaluated by a neurologist, he has not received such an evaluation.  *Id.*

In a supplement to the complaint, Longstreet complains that he did not receive treatment until December 16, 2020 for "the issue of me not being able to move my right big toe, my swollen and badly bruised leg and the fact that the lower half of my leg and foot is numb." ECF 13 at 2. He claims he submitted two sick call slips between November 25 and December 16, 2020 but was told that Physician's Assistant ("PA") Crystal Jamison said the symptoms were normal after being stabbed and he did not need to be evaluated.  *Id.*  He claims he begged the midnight shift officers to call for medical attention due to the severe pain and the large amount of blood leaking from the stab wound, "which had lacerated [his] peroneal nerve."  *Id.*  He states he was seen on December 8, 2020 but the only treatment he received was "injecting an antibiotic into [his] buttock."  *Id.* at 3.  On that date, it was determined that Longstreet had developed cellulitis.  *See* ECF 20-1 at 48-49 (medical record).

Longstreet adds that he completed physical therapy on April 6, 2021, but that it only caused more pain.  ECF 13 at 4.  He describes having shocking nerve pain in his leg and foot since being stabbed and being unable to move two of his toes.  *Id.*  In addition, Longstreet believes that he

sustained an injury to his skull when he was stabbed in the neck because he has severe migraines and "issues with [his] left ear." *Id.* He states that an x-ray performed on January 23, 2021 confirmed he had sustained an injury to his neck. *Id.* The supplement to the complaint does not seek to add any defendants to this case.

Longstreet states that he fears he will be unable to work after he is released from prison because his left leg injury has made it more difficult to walk a long distance or to stand longer than a few minutes. ECF 1 at 7-8, ¶ 20. He also describes having difficulty sleeping when another inmate is assigned to the cell with him and feeling anxious about another attack given the ease with which inmates can manufacture weapons from the metal lockers inside the prison. *Id.* at 8, ¶¶ 21-22. He explains that Sisler manufactured the weapon he used to attack him by breaking a piece of metal off of his assigned locker inside the cell and sharpening it on the cement floor between the bunk and the door near the sink. *Id.* at ¶ 23.

Longstreet maintains that defendants Warden Campbell, Chief Carter "and the rest of Roxbury Correctional Institution staff are well aware of how inmates destroy the metal lockers to manufacture weapons." ECF 1 at 8-9, ¶ 24. He claims that this is the reason the metal lockers are only located inside of the general population cells and not in segregation. *Id.* In Longstreet's view, this amounts to a choice to protect inmates housed in segregation but not those who are in general population. *Id.* In his experience, the only thing RCI staff does when an inmate has manufactured a weapon from a metal locker, is to simply weld the section that was damaged and leave the locker inside the cell. *Id.* at 9, ¶ 25. This is the basis for Longstreet's request for this court to order Campbell and Carter to remove the metal lockers and "replace them with the plastic totes inmates are given when they are placed on a segregation tier." *Id.* at ¶ 26. Longstreet further suggests that RCI should be locked down while the metal lockers are removed; that efforts should

be taken to keep inmates from finding out in advance about the removal; and that the emergency response team should "search each inmate and each cell with handheld metal detectors." *Id*. at 10-11, ¶¶ 28 and 29.

Longstreet claims that the "unsafe and deadly conditions" at RCI violated his equal protection rights under the First Amendment and subjected him to cruel and unusual punishment in violation of his Eighth Amendment right. ECF 1 at 12, ¶ 32. He seeks declaratory relief, an injunction ordering the removal of "every metal locker" from RCI, compensatory damages of $75,000 from each defendant; and punitive damages of $25,000 from each defendant. *Id*. at 12-13, ¶¶ 34-38.

**B. Defendants' Motion and Exhibits Response**

Defendant Campbell, who is no longer warden at RCI, and Defendant Carter assert that they did not have any forewarning that Sisler presented a threat to Longstreet. ECF 17-1. They explain that Longstreet and Sisler were cellmates from October 23, 2020 to November 25, 2020, the date of the attack. ECF 17-2 at 3, 7.[5] On August 26, 2020, Longstreet was interviewed and expressed that he had no reason to fear going into general population. *Id*. at 9 (PREA Intake Screening Scoresheet).[6]

Defendants maintain that the complaint does not allege that Longstreet notified either Campbell or Carter of a threat to his safety; rather, Longstreet alleges only that he wrote to defendants regarding his allegation that Officer Wells was not staffing the tier desk. ECF 17-1 at 2. They point out that, according to the complaint, the first incident that caused Longstreet to

---

[5]     Cites to page numbers correspond to the numbers assigned by the court's electronic docketing system.

[6]     There is no document memorializing the interview of Longstreet.

consider Sisler a threat was the day of the attack, when he overheard Sisler talking to Wells.  *Id*.

at 3.  The assault on Longstreet then took place approximately one hour later.

Defendants dispute that Longstreet's wrists were injured due to the handcuffs Officer

Oteng placed on him and maintain that Longstreet reported the wounds occurred during the assault

when he was examined by medical staff.  ECF 17-4 at 95, 102 (medical records).  However, the

records cited by defendants do not memorialize any report by Longstreet that his wrists were

injured during the assault; rather, the reports from the health care workers do not indicate that

Longstreet claimed the wrist injuries were a result of the assault.  Longstreet did, however, state

during the interview by the Internal Investigation Division ("IID") detective that his hands had

been stabbed; he did not say anything about his wrists.  ECF 17-3 at 8.  Medical records show he

had 8 sutures in his left wrist.  ECF 17-4 at 5.

Defendants assert that Longstreet received appropriate medical care following the assault.

ECF 17-1 at 4.  They also assert in their declarations in support of their motion that neither of them

has the authority or expertise to require particular medical care for inmates.  ECF 17-5 at 2, ¶ 4;

ECF 17-6 at 2, ¶ 4.  In a response to Longstreet's complaint that he had not received any treatment

for his injuries, correspondence from Lynda Beardsley, LPN, Statewide Ombudsman, includes the

following summary of his care:

> On 11/25/2020, Mr. Longstreet, you received an order for Kefles [sic] and
> tetanus.  [You] received wound care orders and follow up appointment to be
> scheduled.  On 12/8/2020 you began to develop cellulitis.  You were treated with
> Doxycycline and Rocephin and follow up appointment on 12/16/2020.  On that
> date, you presented with a superficial fluctuant (varying or unstable) mass
> beneath the left lateral laceration site having serosanguineous (serum and blood
> mixed) drainage.  You stated your wound needed "drained."  You were educated
> on the procedure and agree to an I&D (incision and drainage).  The hematoma
> (bruise) that had developed beneath the laceration site was evacuated and the . .
> . wound was packed.  Dressing orders and follow up appointment was placed.
> You had your follow up on 12/18/2020.  Significant improvement to edema was
> noted and follow up orders were placed.  You were evaluated by the site

physician on 1/15/21 when you began developing foot drop, and you were referred to a podiatrist. You were seen on 1/11/21 . . . and placed orders for AFO and placed for a follow up order in one month with plan to reassess for return of motor function and perform tendon transfer or fusion if there was no improvement with splinting. You were evaluated for chronic care on 1/13/21. Headaches and neck pain were not mentioned in any of the above notes. The NP does not recall you complaining of headaches during any of the visits. You were seen by a nurse sick call on 1/16/21 where your headaches were discussed. When you were seen for your chronic care visit, the physician ordered Excedrin Migraine.

On 7/9/2020 [you were] seen by Dr. Berger and . . . stated that [you were] doing well with his previously prescribed diabetic shoes. There was nothing noted in this note that suggested another pair of diabetic shoes.

You receive ongoing physician and nursing intervention for your condition by requesting to be seen via sick call request or as part of ongoing chronic care visits conducted each 90 days. If you have any further questions or concerns, please do not hesitate to let us know.

ECF 20-1 at 48 and 50.

Defendant Carter states in her declaration that all metal lockers were removed from inside the cells at RCI as of April 2, 2021. ECF 17-6 at 3, ¶ 7.

## C. Longstreet's Opposition

In his opposition, Longstreet maintains for the first time that he notified Campbell of problems he was having with Sisler by letter dated November 2, 2020. ECF 20 at 1; ECF 20-2 at 1, 3. The letter contains no indicia that it was ever received by the Warden's office. ECF 20-2 at 1, 3. Longstreet does not reference this letter or its contents in his complaint. Rather, Longstreet asserts under oath in his opposition that the letter should have been in his prison base file and the fact that defendants did not "retrieve said letter" is, in his view, evidence that defendants are attempting to thwart his ability to litigate his claim.[7]  ECF 20 at 1.

---

[7]    The Court notes that Longstreet's claim, as stated in his complaint, is that the defendants knew about the danger posed by the presence of metal lockers inside the cells at RCI, not that they knew specifically of a danger posed to him by Sisler.

Longstreet also claims, for the first time in his opposition, that Sgt. Blankley and Sgt. C. Henderson attempted to move him to another cell, but the move could not be accomplished due to the fact that the new cell where he was to be moved already housed an inmate who also uses a cane.  ECF 20 at 2; ECF 20-1 at 1 (10/23/2020 entries by Charles Henderson indicating two cell assignments for the same day).  According to Longstreet, Blankley refused to move Sisler into the other cell and left Longstreet in the cell with him.  ECF 20 at 2.  Longstreet includes no information indicating that either of the defendants knew about the attempt to move him from the cell with Sisler, nor does he allege the attempted move was occasioned by his complaint that Sisler presented a threat to him.  *Id*.

Longstreet also includes other extraneous matters that are not directly related to the sole claim raised in his complaint: that defendants Campbell and Carter failed to protect him from the violent attack by his cellmate because they failed to remove metal lockers from inside the cells at RCI despite knowing weapons were being made from pieces of the lockers.  ECF 1.

### D.  Replies and Surreplies

Defendants stated in their reply that Longstreet's November 2, 2020 letter, even if received, would be insufficient to amount to a notification that Longstreet feared for his safety because it focused on his claim that Officer Wells was harassing him.  ECF 23 at 2.  They further note that they do not recall receiving the letter from Longstreet.  *See* ECF 17-5; 17-6 (declarations).  Despite Longstreet's claim that the letter was sent to Campbell and that it should be in his prison base file, neither Campbell nor Carter received the letter, and it was not placed in his file.  ECF 23-1 (Decl. K. Gorsuch), ECF 23-2 (Decl. Campbell), ECF 23-3 (Decl. Carter).  Because they do not recall receiving the letter, neither Defendant formed a belief regarding Longstreet's safety in November of 2020.  *Id*.

Defendants further assert that the metal lockers that were inside inmates' cells at RCI were removed and that the metal lockers that remain are in areas of the prison that are monitored by correctional officers and live monitoring cameras.  ECF 23-3 (Decl. Carter).  It is this assertion that prompted Longstreet to file his "Affidavit of Truth" in which he argues that the metal lockers that remain at RCI are not closely monitored and, as proof, he included as an exhibit a small piece of metal he removed from one of those lockers.  ECF 25.  This Court permitted Defendants to file a surreply addressing Longstreet's claim and declined to strike Longstreet's pleading as an unauthorized surreply.  ECF 28.

Defendants provide declarations from correctional staff at RCI that establishes that the attempt to move Longstreet from his cell with Sisler was unrelated to any claim that his life was in danger.  Rather, Longstreet received a medical order for a lower bunk and the attempt to move him to another cell to accommodate the order was unsuccessful due to another inmate who was assigned to that cell having a similar medical order.  *See* ECF 30-2 at 3 (10/21/20 med. Record stating "bottom bunk papers renewed"); ECF 30-3 at ¶3 (Decl. Henderson); ECF 30-4 at ¶¶3-4 (Decl. Lt. Sheppard); ECF 30-5 at 3 (showing change from upper to lower bunk), *see also* ECF 30-6 at ¶ 3 (Decl. Sgt. Blankley indicating Longstreet never stated he feared for his safety).  The same day, Longstreet was moved back in with Sisler and Sisler was assigned the top bunk.  ECF 30-5 at 3.

Defendants also provide declarations from correctional officers in charge of transporting inmates from one prison to another who describe the manner in which inmates are searched prior to their transfer.  ECF 30-5 at 4-7 (strip search logs); ECF 30-7 at ¶¶ 4-6 (Decl. Corp. Golliday); ECF 30-8 at ¶¶4-6 (Decl. COII Kershner); ECF 30-9 at ¶3 (Decl. Sgt. Patey indicating no metal found in Longstreet's property); ECF 30-10 at ¶¶3-7 (Decl. Sgt. Knieriem indicating in part that

MCIH has metal lockers in quarantine cell where Longstreet was held after transfer); *see also* ECF 30-11 (Decl. Lt. White indicating Longstreet never gave him a piece of contraband metal).  The implication of those declarations is that Longstreet could not have possessed the piece of metal he filed as an exhibit when he was transferred from RCI to MCIH.  Longstreet filed the piece of metal in this Court in September, 2021, and he had been transferred to MCIH by August 16, 2021.  ECF 20-3.  Each officer charged with searching inmates indicates that the piece of metal filed by Longstreet would have been discovered during a strip search and would have been visible when his personal property was searched and x-rayed.  While none of the officers recall Longstreet personally, they indicate that they would have remembered if something unusual, *i.e.*, locating a piece of metal secreted either on his person or in his property, had happened when Longstreet was transported from one prison to another because it would have required a written report as well as a Notice of Infraction for possession of contraband.

### Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams*

*Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222(4th Cir. Nov. 29, 2016) (per curiam). However, when the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous

material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. July 14, 2016) (per curiam); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

14

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 F. App'x at 638.

Longstreet has not filed an affidavit under Rule 56(d), has not alleged that more discovery is necessary (other than some discovery about plastic totes which would not rectify the deficiencies described herein), and has submitted his own exhibits. I am satisfied that it is appropriate to address Defendants' motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004.  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment.  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. "[T]the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### Discussion

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency. Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows

of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837, *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials."  *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832).  Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . .  'reasonable measures to guarantee the safety of the inmates.'"  *Id*.  "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety."  *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).  A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established.  *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury.  *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014).  The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v. McKinney*, 509 U.S. 25, 36 (1993).  A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment.  *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety."  *Farmer*, 511 U.S. at 834.  Evidence establishing a culpable state of mind requires actual knowledge of an

18

excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id*. at 837.  A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128.

The claim stated in Longstreet's complaint is that the metal lockers inside inmates' cells posed a danger to his safety and to the safety of the entire prison population.  The assault Longstreet suffered at the hands of his cellmate resulted in serious harm; however, there is no evidence that Defendants Campbell and Carter were informed that Sisler had threatened Longstreet or that he was in possession of a weapon made from a locker.  Longstreet's eleventh-hour production of a letter stating that he feared Sisler because he had threatened him and Sisler was in the process of sharpening a piece of metal for use as a weapon does not establish that the letter was sent to either of the Defendants named in this lawsuit.  With regard to the danger posed by the metal lockers, correctional employees are not charged with insuring against every potential manner in which furniture and other prison structures can be used as weapons.  Longstreet's assertion that he obtained a piece of metal from the lockers that remained in place at RCI is not a material fact. Whether the piece of metal Longstreet filed with this court came from RCI or somewhere else does not establish that defendants Campbell and Carter had actual knowledge that Longstreet's life was endangered by the presence of a metal locker in his cell.

To the extent that Longstreet's claim against Campbell and/or Carter is based on their positions as supervisors of employees who knew or should have known that Sisler possessed a dangerous weapon or that the metal locker inside Longstreet's cell was being mined for weapons,

the claim fails.  Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation.  It is well established that the doctrine of respondeat superior does not apply in § 1983 claims.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'"  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).  Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  As outlined above, Campbell and Carter had no actual or constructive knowledge that any of the correctional officers working on Longstreet's housing unit were engaged in conduct that created a pervasive and unreasonable risk to him.

**Conclusion**

Based on the record evidence before this Court, Defendants Campbell and Carter are entitled to summary judgment in their favor.  By separate order which follows, Defendants' motion shall be granted and Longstreet's motion for injunction shall be denied.

November 10, 2021                                                  /s/
Date                                                    Stephanie A. Gallagher
                                                        United States District Judge